UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| BRADY BUCK FLEMING,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 17-cv-04145-RMI<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 32, 33 |

Plaintiff, Mr. Brady Buck Fleming, seeks judicial review of an administrative law judge ("ALJ") decision denying his application for supplemental security income under Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Docs. 6 & 9), and both parties have moved for summary judgment (Docs. 32 & 33). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

In February 27, 2014, Plaintiff filed an application for benefits under Title XVI, alleging a disability onset date of October 26, 2013. (Doc. 14, Administrative Record "AR" at 22). The ALJ denied the applications on May 19, 2016 (AR at 37), and the Appeals Council denied Plaintiff's request for review on May 23, 2017 (AR at 1-6).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff alleges disability based on seizures, headaches, and organic brain disorder. (Doc. 32 at 3). The ALJ found that these impairments had been medically determined, and that they were severe. (AR at 24).

*The Medical Evidence:*

On October 23, 2015, Plaintiff was taken to the emergency room due to having two distinct seizure episodes, followed by vomiting and painful headaches lasting several hours. (AR at 378). (*Id*.). The attending physician, Gregory Larsen, D.O., surmised that Plaintiff may have experienced "new-onset seizures," noting that Plaintiff "is not to drive and a DMV note was faxed restricting his driver's license until a doctor can give him medical clearance." (*Id*. at 379). Dr. Larsen also instructed Plaintiff to follow up with his primary care provider or with a neurologist. (*Id*.).

The following week, on October 31, 2015, Plaintiff was treated by his primary care physician, Clifford Jones, M.D., who asked Plaintiff's condition as possibly being grand mal seizures. (*Id*. at 278). Dr. Jones then noted that Plaintiff needed a referral to see a neurologist such that further testing and consultation might determine whether Plaintiff suffers from a seizure

disorder. (*Id.*). In early January of 2014, Plaintiff was treated again by Dr. Jones for a worsening of his headaches. (*Id.* at 405). During a medical visit on January 16, 2014, for electroencephalography, Plaintiff experienced a seizure event which was described in the treatment notes as: "a versive head movement to the right, awakened, had lip smacking, and then appeared to have [an] altered level of consciousness until the episode ended at which time he was able to answer simple questions but was not oriented." (*Id.* at 296).

On February 26, 2014, Plaintiff was seen by his treating neurologist, Donald Iverson, M.D., complaining of intermittent right-side headaches and reporting that he had experienced four more seizure events since October. (*Id.* at 356). Dr. Iverson's impression was that Plaintiff suffered from "[n]ew onset nocturnal seizures with focal onset." (*Id.* at 357). In addition to ordering an MRI scan, Dr. Iverson also changed Plaintiff's seizure medication from Keppra to Dilantin due to side-effects causing irritability and mood swings with the former. (*Id.*).

Less than two months later, on April 13, 2014, Plaintiff was taken to the emergency room due to suffering multiple seizure episodes. (*Id.* at 342-346). The following day, during a follow-up visit, Dr. Iverson treated Plaintiff and noted that his MRI scan revealed, "abnormal right hippocampal architecture and a hippocampal cleft bilaterally." (*Id.* at 306). Regarding Plaintiff's seizures of the previous day, Dr. Iverson increased Plaintiff's dosage of Dilantin. (*Id.*). Because Plaintiff continued to experience "partial complex seizures manifest[ing] as déjà vu," Dr. Iverson once again increased Plaintiff's dosage of Dilantin on May 27, 2014. (*Id.* at 305). Plaintiff continued to experience partial complex seizures; accordingly, Dr. Iverson yet again increased his dosage of Dilantin in May of 2015. (*Id.* at 429). In January of 2016, after noting that the steady increases in the dosage of Dilantin had been ineffective, as Plaintiff continued to experience partial complex seizures, Dr. Iverson noted that he was changing Plaintiff's medication to Tegretol. (*Id.* at 433).

On March 4, 2016, Dr. Iverson prepared a medical source statement in which he gave a summary of Plaintiff's treatment history under his care, as well as offering a series of opinions about Plaintiff's condition and its resulting limitations. (*Id.* at 453-454). Dr. Iverson began by noting that he had been Plaintiff's treating neurologist for nearly two years, providing a summary

3

of Plaintiff's continued seizure episodes during that time. (*Id.*). Based on his treatment, his clinical assessments, and his review of Plaintiff's medical and diagnostic records, Dr. Iverson opined that Plaintiff is likely to either miss work, or to leave early, two or more days per month on a chronic basis. (*Id.* at 454). Dr. Iverson also opined that Plaintiff "has been unable to concentrate on work as much as fifteen to twenty percent of a workday due to interruptions from his anxiety and panic issues in addition to his partial complex seizures." (*Id.*). Additionally, Dr. Iverson noted that Plaintiff should not drive professionally, and that he should avoid exposure to heights, dangerous machinery, hazardous conditions, and that he should not be required to climb ladders or scaffolding. (*Id.*).

Near the beginning of the period during which Plaintiff was being treated for his seizures, in April, June, and October of 2014, a series of non-treating non-examining state agency consultative physicians examined Plaintiff's records. (*Id.* at 77-106). In April of 2014, Dr. Dipsia opined, without any significant explanation, that Plaintiff had no physical exertional limitations, except that he could never climb ropes, ladders or scaffolds, and that he should avoid hazardous machinery and heights. (*Id.* at 86-87). In June of 2014, Dr. Gross found that Plaintiff suffers sustained limitations as to concentration or pace, and that Plaintiff is moderately limited in the following areas: maintaining concentration or pace for extended periods; performing activities within a schedule; working in coordination with, or in proximity to, others; completing a normal workday without interruptions from psychologically based symptoms; and, interacting with the public. (*Id.* at 88-89). In October of 2014, Dr. DeSouza noted that "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim[,] [a]dditional evidence is required to establish current severity of the individual's impairment(s)." (*Id.* at 96).

Also, on May 16, 2014, Plaintiff underwent a consultative psychological examination by Ahmed El-Sokkary, Psy.D., for the purpose of aiding in the disability determination and to provide diagnostic impressions "from a strictly cognitive and emotional standpoint." (*Id.* at 300-302). Dr. El-Sokkary noted that, cognitively and emotionally, Plaintiff demonstrates the capacity to understand, remember, and perform simple tasks, while nevertheless struggling "to maintain a sufficient level of concentration, persistence, and pace which indicates that he would have

4

difficulty in a competitive work setting." (*Id*. at 301). Dr. El-Sokkary also noted that Plaintiff would have "some difficulty in keeping a regular workday/work week schedule without some interruptions from psychiatric symptoms." (*Id*. at 301-302). It should also be noted that Dr. El-Sokkary opined that if Plaintiff's disability application were to be approved, Plaintiff needed "the help of a payee to manage large sums of supplemental funds at this time." (*Id*. at 302).

*Plaintiff's Testimony:*

On March 8, 2016, Plaintiff testified at a hearing before the ALJ. (*Id*. at 44-69). Plaintiff testified that he lives in a trailer on his mother's rural property. (*Id*. at 47-48). Plaintiff also related that he currently serves as a caretaker for his mother's property and her animals, as well as also caring for his uncle's animals. (*Id*. at 48, 51). Plaintiff estimated that caring for these animals involves, "[a] couple of hours a day of my time to let them out in the morning, food and water and chain them up and make sure they wouldn't fight throughout the day and just keep an eye on them." (*Id*. at 51-52). As for his chores that relate to the property itself, Plaintiff stated that his mother has "a yard with dogs that I have to rake[,] [and then] to shovel the yard up after it's been raked and you've got to feed and water them and just try to keep the debris off the road and go behind and shovel a little bit after it's been raked up." (*Id*. at 57). Plaintiff explained that the raking and shoveling mainly involved leaves and small rocks, and that he would most often "probably go out like two or three hours most days and then relax the rest of the day." (*Id*.). Due to his seizures, headaches, and sensitivity to light, Plaintiff wears a hat and sunglasses while also having something cool wrapped around him when doing this type of work. (*Id*. at 54).

Plaintiff also testified about the symptoms associated with his partial complex seizures, referring to them as "heat flash seizures." (*Id*. at 52-54). He described the experience as such: "I feel my body like start to heat up and then my face would start sweating and I'd have to sit down and I could feel like the inside of my clothing like start to warm up and like sweat . . . My chest starts to sweat and back area starts sweating . . . I've got to sit down and wait to cool off and try to get somewhere in a cool area." (*Id*. at 52). Plaintiff noted that these episodes occur at least once a week, that they last from 10 to 20 minutes, and that the episodes are sometimes triggered by exposure to sunlight or strong fluorescent lights. (*Id*. at 53). The aftermath of these episodes

5

involves "compression headaches" where Plaintiff's "head feels like it's being squeezed on," or as though he had been "punched in the side of the head, either in the front or back, different spots at certain times." (*Id*.). Plaintiff then estimated that each of these episodes, including the heat flashes, and the ensuing compression headaches, typically last for about two hours. (*Id*. at 55). Noting the fact that time is difficult to estimate during a seizure episode, Plaintiff added that sometimes when he experiences one and thinks that it lasted a certain amount of time, he is surprised to hear from his girlfriend or mother that it was of an entirely different duration in "regular time." (*Id*. at 59-60).

*The Vocational Expert ("VE") Testimony:*

The VE was asked by the ALJ whether there would be any work for a hypothetical individual of Plaintiff's age and education with no past relevant work that is limited to medium work; to never climbing ladders, ropes, or scaffolding; to never being exposed to unprotected heights or moving mechanical parts; and that is also limited to performing simple and routine tasks. (*Id*. at 70). The VE answered in the affirmative and suggested the jobs of hand packer, recycler, and grocery bagger. (*Id*.). The ALJ then asked the VE to assume the same hypothetical but with the additional limitations "of moderate office, light frequent handling and fingering with the rights hand," and asked the VE if such a person could perform any work. (*Id*. at 71). The VE answered in the affirmative and suggested that the positions of recycler and grocery bagger would still fit that description, as well as the job of a vegetable packer. (*Id*. at 71-72). The ALJ then asked the VE whether any work would be available for the hypothetical person just described, but who would be off-task 20 percent of the workday. (*Id*. at 72). The VE answered in the negative. (*Id*.). The VE also noted that if the person described in these hypotheticals was required to sit throughout the workday, there would be no jobs available. (*Id*. at 73).

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that he has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or

more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[1] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. (*See* AR at 24-37).

At Step One, the claimant bears the burden of showing he has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (AR at 24).

At Step Two, the claimant bears the burden of showing that he has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: seizures, headaches, and "organic mental disorder." (AR at 24).

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing his impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or

---

[1] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical, though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

7

combination of impairments that met or medically equaled one of the listed impairments. (AR at 25-29). Next, the ALJ determined that Plaintiff retained the RFC "to perform medium work" with several physical and environmental limitations. (AR at 29-35).

At Step Four, the ALJ determined that Plaintiff has no past relevant work. (AR at 35).

At Step Five, the ALJ concluded that based on the testimony of the vocational expert, and the ALJ's formulation of the RFC, that Plaintiff was capable of engaging in employment (such as grocery bagger, recycler, or vegetable packer) that existed in significant numbers in the national economy; and thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from February 27, 2014, through the date of the decision. (AR at 36-37).

**ISSUES PRESENTED**

Plaintiff presents the following arguments: (1) that the ALJ erred in rejecting the opinion of Plaintiff's treating neurologist; (2) that the ALJ erred in rejecting the opinion of the state agency psychologist who examined Plaintiff; (3) that the ALJ erred in rejecting Plaintiff's symptom testimony; and, (4) that the ALJ erred by formulating a RFC that was not based on substantial evidence. Additionally, Plaintiff requests that the ALJ's decision be reversed, and that the case be remanded for calculation and payment of benefits.

**DISCUSSION**

In formulating Plaintiff's RFC, the ALJ stated that she gave "partial weight" to the opinions of Plaintiff's treating neurologist, Dr. Iverson; however, the ALJ rejected Dr. Iverson's opinions as to Plaintiff's limitations. (AR at 32-33). Likewise, the ALJ stated that she gave "great weight" to the opinion of the consultative psychological examiner, Dr. El-Sokkary; however, several of Dr. El-Sokkary's opinions were either overlooked or implicitly rejected. (*Id*. at 34). While the ALJ found that Plaintiff's impairments could reasonably be expected to cause the symptoms he had alleged, the ALJ found that Plaintiff's testimony about the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id*. at 31). Based largely on the limitations opinions expressed by non-examining state agency consultants in 2014, as well as portions and snippets of the opinions of Drs. Iverson and El-Sokkary, the ALJ found that Plaintiff retained the RFC for

8

1  medium work with the following limitations: never climbing ladders, ropes, or scaffolds; never
2  being near unprotected heights or moving mechanical parts; having only moderate exposure to
3  office light; and the performance of simple routine tasks. (*Id*. at 29).

*The Opinions of the Treating and Examining Physicians:*

Plaintiff was treated for his neurological conditions for nearly two years by Dr. Iverson, and at the end of that period of treatment, Dr. Iverson prepared a medical source statement in which he stated that based on his two-year course of treatment, his clinical assessments, and his review of Plaintiff's medical and diagnostic records, Plaintiff is likely to either miss work, or to leave early, two or more days per month regularly, and that Plaintiff can be expected to be off-task "as much as fifteen to twenty percent of a workday due to interruptions from his anxiety, his panic issues, and in addition to his partial complex seizures." (AR at 454).

The ALJ rejected these opinions merely by stating that they are "not supported [sic] the medical evidence of record including Dr. Iverson's contemporaneous treatment notes." (*Id*. at 33). The only other justification given by the ALJ for rejecting Dr. Iverson's opinions as to Plaintiff's limitations is that "[b]ased on claimant's testimony and treatment records routinely showing that the claimant is not anxious at medical appointments, the record does not support the severity of Dr. Iverson's limitations." (*Id*.). Additionally, the ALJ reasoned that the restoration of Plaintiff's driving privileges somehow contradicted Dr. Iverson's opinions about Plaintiff's limitations. (*Id*.).

An ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Even when such an opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id*. at 830-31. However, an ALJ "need not discuss all evidence presented." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Instead, an ALJ must only explain why "significant probative evidence has been rejected." *Id*.; *see also Cotter v. Harris*, 642 F.2d 700, 706-07 (3rd Cir. 1981); *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984). Generally, more weight is given to a treating physician's opinion than to the opinions of those who do not treat a claimant. *See Lester*, 81 F.3d at 830. On the other hand, an ALJ need not always accept the

9

opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." *Batson v. Commissioner of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion, however, is "entitled to greater weight than the opinion of a nonexamining physician." *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence only if "it is consistent with other independent evidence in the record." *Id*. at 830-31; *Tonapetyan*, 242 F.3d at 1149.

Here, the ALJ stated that the opinion of Plaintiff's treating neurologist as to Plaintiff's limitation was being rejected because it was not supported by his treatment notes. However, the ALJ provided no explanation or detail as to the supposed gap between limitations that may be gleaned from reading a treating neurologists notes and those expressly stated by the doctor. The ALJ also reasoned that since there was no indication that Plaintiff was anxious during medical appointments, this absence of evidence of anxiety somehow contradicted Dr. Iverson's opinions that Plaintiff would be off-task between 15 and 20 percent of the time, and that he would miss some or all of two workdays per month regularly. However, because the ALJ provided no further explanation in this regard, it remains unclear what one thing has to do with the other. Lastly, the ALJ reasoned that the restoration of driving privileges somehow contradicts Dr. Iverson's limitation opinions; but, because the ALJ also provided no explanation for this reasoning, it is likewise unclear what, if any, relevance may exist between being allowed by the State to have a driver's license and missing two days of work per month or being off-task at work for as much as 20 percent of the workday.

Additionally, following a consultative psychological examination, Dr. El-Sokkary ventured to provide diagnostic impressions, "from a strictly cognitive and emotional standpoint," and noted that while Plaintiff has the capacity to perform simple tasks, he nevertheless would have difficulty in "maintain[ing] a sufficient level of concentration, persistence, and pace which indicates that he would have difficulty in a competitive work setting." (AR at 301, 302). Dr. El-Sokkary also noted that Plaintiff would have "some" unspecified degree of difficulty in keeping a regular

workday/work week schedule without "some" unspecified degree of interruptions from psychiatric symptoms." (*Id.*). Likewise, the ALJ ignored or rejected these cognitive and emotional limitations which appeared to be less specific than those opined by Dr. Iverson, but nevertheless still consistent. The court finds that none of the reasons given by the ALJ for rejecting the limitations opinions of Drs. Iverson and El-Sokkary are either specific or legitimate. Accordingly, the ALJ erred in rejecting these opinions. Instead, the ALJ should have either given controlling weight to these opinions, or, the ALJ should have given specific and legitimate reasons supported by independent substantial evidence in the record for rejecting them in favor of limitations opinions given by non-treating non-examining state agency consultants who merely reviewed Plaintiff's records from 2014 and earlier. Therefore, the court finds that the ALJ's weighing of the medical opinions was not supported by substantial evidence.

*Plaintiff's Symptom Testimony:*

In rejecting Plaintiff's testimony as to the severity of his symptoms from suffering partial complex seizures, along with the resulting headaches, the ALJ stated that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms are "not entirely consistent" with the medical evidence in the record. (AR at 31). The court finds this statement to be unclear – as the phrase "not entirely consistent" sheds no light on the weight that was given to this testimony, or to what degree it was, or was not, consistent with any specific evidence in the record. *See e.g., Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010) ("It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness's testimony is "not entirely credible" yields no clue to what weight the trier of fact gave the testimony."). When there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). Here, the ALJ did not point to any part of the record that would cast any doubt on any portion of Plaintiff's testimony about the pain associated with his headaches, or the various conditions associated with his seizure episodes; nor has the court's review of the record revealed any such evidence. To the contrary, the overwhelming bulk of the medical evidence supported and corroborated Plaintiff's testimony.

11

Accordingly, the ALJ erred in rejecting Plaintiff's testimony about the intensity, persistence, and limiting effects of his symptoms.

*The RFC:*

Dr. Iverson treated Plaintiff for his seizure disorder for two years starting in early 2014. During the course of his treatment, as described in detail above, Dr. Iverson frequently changed the dosage or type of anti-seizure medication being administered to Plaintiff in order to address Plaintiff's continuing seizure activity. Early on in this process, in 2014, a number of state agency consultants reviewed Plaintiff's medical records from 2014 and earlier and opined the series of limitations on which the ALJ largely based her formulation of the RFC.

The ALJ stated that she afforded "great weight" to the opinions of Drs. Gross and Jacobs (AR at 35), however, Dr. Gross found that Plaintiff suffers sustained limitations as to concentration or pace, and that Plaintiff is moderately limited in the following areas: maintaining concentration or pace for extended periods; performing activities within a schedule; working in coordination with, or in proximity to, others; completing a normal workday without interruptions from psychologically based symptoms; and, interacting with the public (*Id*. at 88-89). These concerns about Plaintiff's limitations regarding concentration or pace appear (albeit generally, rather than specifically, stated) to be consistent with the concentration or pace limitations outlined by Drs. Iverson and El-Sokkary that were rejected by the ALJ. Additionally, the ALJ failed to take account of the fact that Dr. DeSouza had noted in October of 2014 that "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim[,] [a]dditional evidence is required to establish current severity of the individual's impairment(s)." (AR at 96).

Thus, the RFC in this case was formulated by an adoption of the limitations assessments made by the non-examining non-treating physicians that were then slightly tempered with a few additional exertional and environmental limitations. While the ALJ's justification for this RFC was a series of conclusory statements about its reasonableness in light of the record (*see id*. at 35), the court finds that the RFC, as formulated, is not based on substantial evidence because the ALJ improperly rejected the limitations opinions of Plaintiff's treating neurologist, as well as the limitations opinions of an examining psychologist. The opinion of a non-examining physician

12

cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *See Lester*, 81 F.3d at 831; *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (report of non-treating, non-examining physician, combined with the ALJ's own observance of the claimant's demeanor at the hearing did not constitute substantial evidence and, therefore, did not support the Commissioner's decision to reject the examining physician's opinion that the claimant was disabled); *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990) (non-examining doctor's opinion "with nothing more" did not constitute substantial evidence). Accordingly, the court finds that the formulation of the RFC in this case was not supported by substantial evidence.

*Credit-As-True Doctrine:*

Having found that the Commissioner committed errors by not stating specific and legitimate reasons for rejecting the limitations opinion of Plaintiff's treating neurologist, the limitations opinion of the examining psychologist, and Plaintiff's symptom testimony, the court must now decide if remand for further proceedings is appropriate.

It is well established that "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded [for further proceedings]." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). It is equally well established that courts are empowered to affirm, modify, or reverse a decision by the Commissioner, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). Generally, remand with instructions to award benefits has been considered when it is clear from the record that a claimant is entitled to benefits. *Id*.

The credit-as-true doctrine was announced in *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396 (9th Cir. 1988) ("*Varney II*"), where it was held that when "there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony . . . [instead] we will . . . take that testimony to be established as true." *Id*. at 1401. The doctrine promotes fairness and efficiency, given that remand

13

for further proceedings can unduly delay income for those unable to work and yet entitled to benefits. *Id.* at 1398.

The credit-as-true rule has been held to also apply to medical opinion evidence, in addition to claimant testimony. *Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989). The standard for applying the rule to either is embodied in a three-part test, "each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020.

It should also be noted that "the required analysis centers on what the record evidence shows about the existence or non-existence of a disability." *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). Thus, even though all conditions of the credit-as-true rule might be satisfied, remand for further proceedings would still be appropriate if an evaluation of the record as a whole creates a "serious doubt" that a claimant is, in fact, disabled. *Garrison*, 759 F.3d at 1021. On the other hand, it would be an abuse of discretion for a district court to remand a case for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that the claimant is not, in fact, disabled. *See id.*

Here, Plaintiff requests a reversal of the non-disability determination and an award of benefits (Doc. 32 at 17), where Defendant argues that in the event the court finds reversible error, further administrative proceedings are necessary to resolve conflicts or ambiguities in the record. (Doc. 33 at 23). The court finds Defendant's argument for further administrative proceedings to be persuasive primarily because the court finds the administrative record to contain a number of ambiguities, as well as important statements that are subject to varying interpretations.

The court finds the following portions of the record to be noteworthy when determining both that the record in this case has not been fully developed, and that the record as a whole is unclear as to whether or not Plaintiff is in fact disabled. At the hearing, the ALJ did not adequately

14

question Plaintiff regarding his caretaking functions that involved shoveling unspecified amounts of leaves and gravel in an unspecified amount of time and with an unspecified frequency. Nor did the ALJ ask the VE about hypothetical persons exhibiting the neurological and psychological limitations opined and articulated by Dr. Iverson and Dr. El-Sokkary. Further, Dr. Iverson's opinions regarding Plaintiff's limitations have been articulated in a manner that leaves room for interpretation. Where Dr. Iverson opined that Plaintiff was likely to miss work, or leave early, two or more days per month – questions arise. There is a material difference between missing an entire workday and leaving early; additionally, leaving early could mean anything from missing a few minutes of work to missing nearly 8 hours. Where Dr. Iverson noted that Plaintiff "has been unable to concentrate on work as much as fifteen to twenty percent of a workday," the resulting question is whether this is merely a statement of Plaintiff's past condition, or whether it is an opinion about Plaintiff's expected condition. Likewise, where Dr. El-Sokkary opined that Plaintiff would have difficulty in a competitive work setting, it is unclear whether the opinion encompassed a surmountable or insurmountable level of difficulty. Because of these and other ambiguities in the administrative record, the court will not apply the credit-as-true rule; instead, the matter is remanded to the Commissioner for further proceedings consistent with this opinion.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS this matter for further proceedings consistent with this opinion.

A separate judgment shall issue.

**IT IS SO ORDERED.**

Dated: September 24, 2018.

ROBERT M. ILLMAN
United States Magistrate Judge